

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed March 4, 2019**

**United States Bankruptcy Judge**

---

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| SCOTT JOSEPH BREI, | § | CASE NO. 18-31920-SGJ-7 |
| *Debtor.* | § | (Chapter 7) |

---

| | | |
|---|---|---|
| SCOTT JOSEPH BREI, | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | ADV. NO. 18-03211-SGJ |
| | § | |
| BEN BRINCK, ASSET ACCEPTANCE, | § | |
| LLC f/k/a ASSET ACCEPTANCE CORP., | § | |
| and HUDSON & KEYS, LLC, | § | |
| *Defendants.* | § | |

---

| | | |
|---|---|---|
| BEN BRINCK, | § | |
| *Counter-Plaintiff,* | § | |
| | § | |
| v. | § | |
| | § | |
| SCOTT JOSEPH BREI, | § | |
| *Counter-Defendant.* | § | |
| | § | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW IN SUPPORT OF DECLARATORY JUDGMENT THAT: (A) THE DEBTOR'S MOCKINGBIRD PROPERTY WAS HOMESTEAD IN CHARACTER; AND (B) THE DEFENDANTS' LIENS THEREON ARE VOID

The  Chapter 7 Debtor, Scott Brei (the "Plaintiff/Debtor"),[1] filed the above-referenced adversary proceeding (the "Adversary Proceeding") on June 15, 2018, seeking a declaratory judgment that three, separate liens on his real property located at 4509 Mockingbird Lane in Highland Park, Dallas County, Texas (the "Mockingbird Property"), which he claims as his Texas homestead, were invalidly attached and should be declared void.  The three defendants with alleged liens are: Hudson & Keyes, LLC (a small judgment creditor); Asset Acceptance, LLC (another small judgment creditor); and Ben Brinck (an individual who made a $75,000, one-year-term, 12% loan to the Plaintiff/Debtor and his then-wife, back in the year 2004, and purported to take a junior lien on each of *two residential properties* they owned, including the Mockingbird Property).  Defendants Hudson & Keyes, LLC and Asset Acceptance, LLC both failed to answer or otherwise defend in the Adversary Proceeding, although duly served; thus, default judgments will be entered as to them.[2]  Ben Brinck (the "Defendant/Brinck") filed an answer and a counterclaim against the Plaintiff/Debtor, requesting a declaratory judgment in his favor—specifically asking this court to declare that his lien is, indeed, valid against the Mockingbird Property because, while he does not dispute that the Mockingbird Property is *now* being used as the Plaintiff/Debtor's homestead, he states that it was *not* the Plaintiff/Debtor's exempt homestead fifteen years ago, at the time his note and deeds of trust were executed. Rather, the Defendant/Brinck argues, a different real property located at 148 Bayside Drive in Malakoff, Henderson County, Texas (the "Malakoff Property")—which was long ago foreclosed upon by another, senior lender—was being used as the Plaintiff/Debtor's homestead and the Mockingbird Property was *a secondary residence*.  Therefore, the Defendant/Brinck has asserted that he has a valid lien against the Mockingbird Property and should be permitted to foreclose on

---

[1] This was originally a Chapter 11 case that the Debtor converted to Chapter 7 on September 13, 2018.

[2] Accordingly, the Plaintiff/Debtor is directed to submit Default Judgments for these two defendants.

the Mockingbird Property.  The Defendant/Brinck's primary evidence is:  (a) testimony of the Debtor's ex-wife (testifying that the Malakoff Property was the family's homestead back in 2004, not the Mockingbird Property); (b) designations of homestead on file in the Henderson County property records and with the appraisal district (as to the Malakoff Property) before, during, and after the time that the Defendant/Brinck made his loan; and (c) the absence of a homestead designation on file in the Dallas County appraisal district records for the Mockingbird Property in the years shortly before, during, and after the time that the Defendant/Brinck made his loan.

Accordingly, this Adversary Proceeding requires the court to revisit some of the basic principles of Texas homestead law including:  (a) the very narrow set of circumstances, under the Texas Constitution and statutes, when liens can encumber a homestead; (b) the short hurdle of a property owner to establish the homestead character of his property; (c) the tougher hurdle for one to disprove the property's homestead character (such as through abandonment), once homestead character is initially established by the owner; (d) some of the complexities that arise with dual residences when there is ambiguity as to which one is the debtor's homestead (sometimes, in such situations, a ***declaration*** of homestead or non-homestead usage, provided by a borrower to a lender, may operate as an estoppel against the borrower, but estoppel has rarely been applied by courts and, in any event, there was no such declaration provided in the case at bar); and (e) the general inability of a lender to rely on ***designations*** of homestead in county records (*i.e.,* property records or appraisal district records) to estop a borrower from claiming a homestead—these cannot change the true character of a property as homestead in nature, and a lender relies on them at his peril, even if the end result seems to reward a dishonest debtor.

On November 19, 2018, this court conducted an evidentiary trial (the "Trial") on this matter.  Based upon the evidence submitted including testimony from the Plaintiff/Debtor, Mary Catherine Brei ("Mrs. Brei" or the "Debtor's Ex-Wife"), and the Defendant/Brinck, the court

finds and concludes that the Mockingbird Property was the Plaintiff/Debtor's exempt homestead at the time the Defendant/Brinck's note and deeds of trust were executed, and, accordingly, the Defendant/Brinck's lien did not attach to the Mockingbird Property and is void.

## I.    JURISDICTION

Bankruptcy subject matter jurisdiction exists in this matter, pursuant to 28 U.S.C. § 1334(b).  This bankruptcy court has authority to exercise bankruptcy subject matter jurisdiction pursuant to 28 U.S.C. § 157(a) & (c) and the Standing Order of Reference of Bankruptcy Cases and Proceedings (Misc. Rule No. 33), for the Northern District of Texas, dated August 3, 1984. This is a core proceeding in which this court has statutory authority to issue final orders, pursuant to at least 28 U.S.C. §157(b)(2)(A), (K), and (O).

## II.    FINDINGS OF FACT

### A.    *The Plaintiff/Debtor's and Mrs. Brei's Acquisition of Two Different Residential Real Properties.*

1.      The Plaintiff/Debtor and Mrs. Brei married in the year 1995.[3]  Shortly before they were married, in 1994, they together purchased the Malakoff Property in Henderson County, Texas.  There was no evidence introduced regarding any loans undertaken for this acquisition.

2.      Then, a few years later, on December 18, 1998, while still owning the Malakoff Property, the Plaintiff/Debtor and Mrs. Brei purchased the Mockingbird Property.  In connection with that purchase, they executed a Promissory Note in favor of Muirfield Mortgage Limited Partnership[4] in the original amount of $238,500.  The Promissory Note was secured by a Deed of Trust on the Mockingbird Property (the "1998 Mockingbird Property Deed of Trust").[5]

---

[3] The Plaintiff/Debtor and Mrs. Brei divorced in 2008.

[4] The Promissory Note and Deed of Trust were assigned over the years and are currently held by Rushmore Loan Services, LLC.

[5] *See* Plaintiff/Debtor Exhibits A & B.

3.      Thus, the Plaintiff/Debtor and Mrs. Brei, beginning in late 1998, owned two residential properties:  One in the prestigious Highland Park area of Dallas, and one not far from Dallas, in a rural area near Cedar Creek Lake.[6]

4.      Paragraph 6 of the 1998 Mockingbird Property Deed of Trust provided that "Borrower shall occupy, establish, and use the Property as Borrower's principal residence within sixty days . . . and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy."[7]

5.      The Plaintiff/Debtor testified that he began occupying the Mockingbird Property within 60 days of signing the 1998 Mockingbird Property Deed of Trust, consistent with Paragraph 6, and further testified that he had continued living in the Mockingbird Property up until the day he filed for bankruptcy.  The court found this testimony credible.

6.      A few years later, on or about October 3, 2001, the Plaintiff/Debtor and Mrs. Brei executed a Homestead Lien Contract and Deed of Trust in favor of Bank One, N.A. as to the Mockingbird Property (the "2001 Mockingbird Property Homestead Loan"), which provided that "Owner represents to Lender that the Property is Owner's homestead."[8]  This appears to have been a home equity loan.

7.      Around the same time, on or about October 18, 2001, a Voluntary Designation of Homestead as to the Mockingbird Property was filed on behalf of the Plaintiff/Debtor and Mrs. Brie in the Dallas County property records.[9]

---

[6] The court takes judicial notice of the fact that Malakoff is a small town near this popular lake.

[7] *See* Plaintiff/Debtor Exhibit B.

[8] Upon information and belief, Bank One, N.A. has merged with JPMorgan Chase Bank, N.A.  *See* Plaintiff/Debtor Exhibit C.

[9] *See* Plaintiff/Debtor Exhibit D.

8.    Interestingly, the Dallas County *Appraisal District* records reflect a gap in time when there was no homestead exemption claimed on the Mockingbird Property by the Plaintiff/Debtor and Mrs. Brie.  Specifically, there was a homestead exemption for the Mockingbird Property for the years 1999-2001, *then a gap for a few years (from the years 2002 through 2008)*, and then a homestead exemption for it again in the years 2009-2018.

> **B.    The Malakoff Property:  Inconsistent Homestead Designations in Property Records and in Appraisal District Records.**

9.    The Plaintiff/Debtor testified that he never considered the Malakoff Property as his homestead.  Moreover, there was evidence submitted showing that the Plaintiff/Debtor *only* signed a "Designation of Homestead and Affidavit of Nonhomestead," on or about October 23, 2000, wherein the Plaintiff/Debtor designated the Mockingbird Property as his homestead and the Malakoff Property as his non-homestead.[10]  This document was filed in the Deed Records for Henderson County on November 7, 2000 and reflects that Wells Fargo Bank requested that it be recorded.  Notwithstanding this filing, other evidence[11] reflected that the Henderson County *Appraisal District* was still showing the Malakoff Property to be homestead property until the property was foreclosed in 2011.  Specifically, the Henderson County *Appraisal District* records reflect that it was claimed as exempt homestead property for tax purposes by the Plaintiff/Debtor and Mrs. Brei from at least as early as the year 1999 through the year 2011[12]—in other words, for at least *13 consecutive years*—even though:  (a) the Mockingbird Property was acquired in

---

[10] *See* Defendant/Brinck Exhibit 10.

[11] Defendant/Brinck Exhibit 4.

[12] *See* Defendant/Brinck Exhibits 4 & 5 and Defendant/Brinck Demonstrative.  Note, no evidence was provided as to what the Henderson County property records reflected *prior* to 1999 (recall that the Plaintiff/Debtor and the Debtor's Ex-Wife purchased the Malakoff Property in *1994*).  However, there was an Application for Residential Homestead Exemption for the Malakoff Property signed by Mary Catherine Miller (*i.e.*, Mrs. Brei) dated February 21, 1995, that was submitted into evidence, and appears to have been received by the Henderson County Appraisal District on February 23, 1995.  *See* Defendant/Brinck Exhibit 3.

late 1998 and the couple had claimed it as exempt in the Dallas County Appraisal District records from 1999-2001 and then again starting in 2009; and (b) the couple had filed a Designation of the Mockingbird Property as a homestead in the Dallas County Property Records in the year 2001 (in connection with a home equity loan on the Mockingbird Property).  Thus, for one reason or another (*e.g.,* innocent inadvertence, chicanery to obtain tax benefits, chicanery to obtain loans, *etc.*), the Plaintiff/Debtor and Mrs. Brie were claiming two homestead exemptions for both residences for several years.  The Debtor/Plaintiff testified that he was not in charge of filing the homestead exemptions for either the Malakoff Property or the Mockingbird Property.

10.     The plot thickens.  On March 19, 2003 (less than two years after taking out a home equity loan in October 2001 on the Mockingbird Property), the Plaintiff/Debtor and Mrs. Brei took out a home equity loan on the Malakoff Property.  Specifically, they signed a "Texas Home Equity Security Instrument" with Ameriquest Mortgage Company in the amount of $296,000 secured by the Malakoff Property (the "2003 Malakoff Property Home Equity Note").[13]  Paragraph 6 of this document provides that "Borrower now occupies and uses the Property as Borrower's Texas homestead and shall continue to occupy the Property for at least one year after the date of this Security Instrument."[14]  The Plaintiff/Debtor testified that when he signed the 2003 Malakoff Property Home Equity Note that he did not adhere to Paragraph 6. However, Mrs. Brei testified that she still believed that the Malakoff Property was her homestead when she signed the 2003 Malakoff Property Home Equity Note.

---

[13] *See* Defendant/Brinck Exhibit 13.

[14] *Id.*

11.     In addition to executing the 2003 Malakoff Property Home Equity Note, the Plaintiff/Debtor and Mrs. Brei also executed a Voluntary Designation of Homestead for the Malakoff Property that was filed in Henderson County on March 19, 2003.[15]

C.     *The Defendant/Brinck Makes a Short-Term Loan to the Plaintiff/Debtor and Mrs. Brei in the Year 2004 and Purports to Take a Junior Lien in Both the Mockingbird Property and the Malakoff Property.*

12.     In early 2004, the Defendant/Brinck worked as a broker in commercial real estate and had been a business and social friend with the Plaintiff/Debtor when they previously worked together at the firm CBRE. The Defendant/Brinck agreed to make a loan to the Plaintiff/Debtor and Mrs. Brei (for reasons that are not entirely clear).

13.     Specifically, on or about February 11, 2004, the Plaintiff/Debtor and Mrs. Brei executed a "Promissory Note"[16] in the original principal amount of $75,000 in favor of Defendant/Brinck (the "Brinck Promissory Note").[17] It was a one-year note (maturing February 11, 2005), with monthly, interest-only payments due, at the rate of 12% per annum. It was secured by a deed of trust on the Mockingbird Property (which acknowledged permitted encumbrances ahead of it, including the 1998 Muirfield Mortgage purchase money lien and the 2001 Bank One homestead lien).[18] It was also secured by a deed of trust on the Malakoff Property (and acknowledged a permitted encumbrance ahead of it: the 2003 Ameriquest Home Equity loan).[19]

---

[15] *See* Defendant/Brinck Exhibit 12.

[16] Unlike the 2001 Mockingbird Property Homestead Loan and the 2003 Malakoff Property Home Equity Note, the Brinck Promissory Note did not contain any representations that it was a loan secured by a lien in the Plaintiff/Debtor's and Mrs. Brei's homestead.

[17] *See* Plaintiff/Debtor Exhibit E.

[18] *See* Plaintiff/Debtor Exhibit F.

[19] *Id.*

14.    The Brinck Promissory Note contained no declarations as to which of the two properties might or might not have been homestead properties.  The Defendant/Brinck did not insist upon a Designation of Homestead or Non-Homestead being filed as to either property.

15.    The Brinck Promissory Note provided that notices to the Plaintiff/Debtor and Mrs. Brei should go to "Scott J. Brei and Mary Catherine Brei, 4509 Mockingbird Lane, Dallas, Texas 75205."[20]

16.    At the time that the Brinck Promissory Note and the Brinck Deeds of Trust were signed, the Defendant/Brinck was living in Iowa and had hired an attorney, Tom Colven, to draft the loan documents.  The Defendant/Brinck testified that he did not do any lien searches on either the Mockingbird Property or the Malakoff Property before loaning money to the Plaintiff/Debtor and Mrs. Brei.  The Defendant/Brinck further testified that he had not even read through the various loan documents but had "perused" them and relied on his attorney to protect his interests.  The Defendant/Brinck also testified that there had never been a single payment on the Brinck Promissory Note.

17.    As earlier mentioned, the Brinck Promissory Note matured in 2005—more than 13 years before the above-referenced bankruptcy case was filed.

18.    The Malakoff Property was foreclosed upon by the first lien holder in September of 2011—well before the above-referenced bankruptcy case was filed. [21]

---

[20] *Id.*

[21] *See* Defendant/Brinck Demonstrative.

**D.**     ***The Overt Indicia of Homestead Character, as to the Mockingbird Property, Shortly Before and After Execution of the Brinck Promissory Note and Deeds of Trust.***

19.     Mrs. Brei testified that she considered the Malakoff Property her homestead from 1994, when it was purchased, until she divorced the Plaintiff/Debtor in 2008.  And yet the facts regarding usage do not seem to square with this alleged belief.

20.     So what were the overt acts of homestead usage as to the Mockingbird Property versus the Malakoff Property, in and around February 2004, when the Brinck Promissory Note and accompanying deeds of trust were given to the Defendant/Brinck?

21.      The Plaintiff/Debtor credibly testified that he and his family were all living at the Mockingbird Property at the time the Brinck Promissory Note was executed.  He said that they went to the Malakoff Property approximately every other weekend.  He never considered the Malakoff Property as his homestead.  Mrs. Brei, on the contrary, testified that she believed that the Malakoff Property was actually the family's homestead when she signed the Brinck Promissory Note.  However, other comments she made seemed to contradict this—such as saying that the family was "always at the lake ***on weekends***" (suggesting a weekend house—as one might expect for a property near a lake).

22.     In addition, by 2003, the Plaintiff/Debtor and Mrs. Brei had three children together (with the third being born in late 2003—not long before the Brinck Promissory Note was executed).  The Plaintiff/Debtor further testified that in 2003, Mrs. Brei was working in downtown Dallas[22] and their then two children were attending school at First Baptist Academy in downtown Dallas.[23]

---

[22] Note that Mrs. Brei testified that she believed that she stopped working sometime in late 2002 and did not have any income for 2003 based on social security statements that she reviewed prior to the Trial.  The court does not believe it is terribly relevant to the outcome of this Trial whether she quit her job in late 2002 or sometime in 2003.

[23] The Plaintiff/Debtor testified that in 2003, he and Mrs. Brei were sending their first two children to First Baptist Academy.  However, Mrs. Brei testified that she believed the children stopped attending First Baptist Academy in 2001.  Counsel for the Plaintiff/Debtor attempted to refresh Mrs. Brei's memory by showing her a photograph of

23.    After having their last child in late 2003 at a hospital in North Dallas, the Plaintiff/Debtor testified that Mrs. Brei no longer worked and stayed home at the Mockingbird Property with all three children.  Mrs. Brei testified, somewhat ambiguously, that after having her third child, the family spent time at both residences.

24.    In August of 2004, the Plaintiff/Debtor and Mrs. Brei began sending their eldest child to school at Bradfield Elementary in Highland Park.[24]  The Plaintiff/Debtor and Mrs. Brei further testified that the remaining two children also began attending Bradfield Elementary once turning the appropriate age and that they continued to live in the Mockingbird Property and send their children to schools in Highland Park, which was important to both of them.[25]

25.    In 2008, the Plaintiff/Debtor and Mrs. Brei divorced.

26.    On or about April 11, 2009, the Defendant/Brinck obtained a judgment against the Plaintiff/Debtor in the amount of $84,000.

27.    On or about April 27, 2009, the Defendant/Brinck filed an Abstract of Judgment.

28.    On or about May 14, 2018, the Defendant/Brinck posted the Mockingbird Property for foreclosure.  The court is unclear why Defendant/Brinck waited so long to pursue recovery.

29.    The Plaintiff/Debtor filed an individual Chapter 11 proceeding on June 5, 2018 (the "Bankruptcy Case").  The Bankruptcy Case was converted to a Chapter 7 proceeding on

---

what he alleged to be her oldest daughter dated October 1, 2003, at an event at First Baptist Academy.  However, Mrs. Brei would not confirm that the photo was actually taken at First Baptist Academy or the exact time it was taken. The court believed the testimony of the Plaintiff/Debtor on this point.

[24] *See* Plaintiff/Debtor Exhibit G.

[25] In October 2004 and March 2005, the IRS also sent letters to the Mockingbird Property to confirm appointments they had made with the Plaintiff/Debtor and Mrs. Brei about their federal income tax returns. *See* Plaintiff/Debtor Exhibits H & I.

September 13, 2018.  On October 16, 2018, the Debtor filed his amended schedules after

conversion [DE # 44], wherein he claimed the Mockingbird Property as his exempt homestead.

30.     While the court found the Debtor/Plaintiff to be mostly credible in his testimony

at Trial, the court does—without a doubt—have concerns about his overall honesty.  For one

thing, the Plaintiff/Debtor testified that he, on at least three occasions, forged Mrs. Brei's

signature to refinance the Mockingbird Property (after their divorce) so that he could "save the

home."[26]  Additionally, it certainly seems likely that the Plaintiff/Debtor played "fast and loose"

with the assertion of homestead exemptions (claiming both properties back and forth,

interchangeably, as homestead property—likely with the goal of obtaining certain benefits when

it suited him).

### III.     CONCLUSIONS OF LAW

#### A.     *The Very Narrow Set of Circumstances, Under the Texas Constitution and Statutes, When Liens Can Encumber a Homestead.*

Against this backdrop, the court is now tasked with determining whether the

Plaintiff/Debtor had a valid homestead claim to the Mockingbird Property *in February 2004*,

when he and his then-wife, Mrs. Brei, executed the note and deeds of trust with the

Defendant/Brinck.  Because if they did, then Defendant/Brinck's lien will be deemed void.

Preliminarily, it is well accepted that Texas law provides extremely broad protection for

individuals' homesteads.  The Fifth Circuit, back in 1992, colorfully described the rich history in

Texas of protecting individual homesteads as follows:

> Even before the ink had dried on the joint resolution of Congress that admitted
> Texas as the twenty-eighth state in the Union, Texas citizens enjoyed broad
> homestead rights. *See* Tex. Const. art. VII, § 22 (1845). Not much has changed in
> the last 145 or so years.  As it did in the dawning days of the state, the homestead
> exemption in Texas continues to "protect citizens and their families from the

---

[26] *See* Defendant/Brinck Exhibit 6.

miseries and dangers of destitution." *Franklin v. Coffee*, 18 Tex. 413, 415-16 (1857).[27]

Fundamentally, a homestead is a legal interest, created through the Texas Constitution and the Texas Property Code, that provides prophylactic protection from seizure ***and encumbrances*** thereon in all but a narrow range of circumstances including for debts incurred to purchase the homestead, for taxes, and for debts owed for work or services performed on the homestead.[28] Additionally, in 1997, the State of Texas, through a Constitutional amendment to the homestead provision of the Texas Constitution approved by Texas voters, became the last state in the nation to allow homeowners to borrow against their home equity.[29] The Texas Constitution was amended again in 2003, authorizing the state legislature to delegate authority to issue interpretations of the home equity lending provisions, and the legislature delegated such interpretive authority to the Finance Commission of Texas and the Credit Union Commission of Texas.[30] The legislation reflects Texas's long history of regarding the homestead as sacrosanct[31] and imposes stringent criteria in order for a lien to attach to a homestead so that foreclosure might be permissible.[32] If the stringent criteria are not met, the lien against the homestead will not be valid. For the avoidance of doubt, the loan made by Defendant/Brinck was ***not*** purported to be a home equity loan—not on its face and no one argued that. Accordingly, if the

---

[27] *Bradley v. Pac. S.W. Bank, FSB (In re Bradley)*, 960 F.2d 502, 505 (5th Cir. 1992), *cert. denied*, *Commonwealth Land Title Ins. Co. v. Bradley*, 507 U.S. 971 (1993).

[28] *See* Tex. Const. art. XVI § 50; Tex. Property Code Ann. § 41.001 (West, Westlaw through 2017 1st C. Sess.); *Heggen v. Pemelton*, 836 S.W.2d 145, 148 (Tex. 1992).

[29] *See* Tex. Const. art. XVI, § 50. *See also Lasalle Bank Nat'l Assoc. v. White,* 246 S.W.3d 616, 618 (Tex. 2007).

[30] *See* Tex. Const. art. XVI, § 50(u); Tex. Fin. Code Ann. §§ 11.308 & 15.413 (West, Westlaw through 2017 1st C. Sess.).

[31] *See Cadengo v. Consol. Fund Mgmt. (In re Cadengo),* 370 B.R. 681, 697 (Bankr. S.D. Tex. 2007).

[32] *See* Tex. Const. art. XVI, § 50(a)(6)(A)-(Q). *See also Doody v. Ameriquest Mortg. Co.*, 49 S.W.3d 342, 343 (Tex. 2001); *Box v. First State Bank*, 340 B.R. 782, 785-86 (S.D. Tex. 2006).

Mockingbird Property was homestead in character in 2004, the Defendant/Brinck's lien thereon was not constitutionally permitted.  Again, when a lien that is not constitutionally permitted is placed on homestead property, the lien is simply void.[33]  Homestead rights protect individuals from losing their homes, and statutes relating to homestead rights are to be liberally construed.[34]

>    **B.**    **Did the Plaintiff/Debtor Meet His Initial Burden of Claiming a Homestead Exemption in the Mockingbird Property?**

The burden of proof regarding a homestead generally works as follows.  The Plaintiff/Debtor, as the claimant of a homestead, has the initial burden[35] to establish the character of the claimed property by showing a combination of both (1) overt acts of homestead usage, and (2) an intention to claim the property as a homestead.[36]  "[M]ere ownership or possessory interest is not of itself sufficient to establish a homestead."[37]  The initial burden is typically a low hurdle and, in the usual case, mere evidence of "overt acts of homestead usage" in the form of possession and usage of the property as a homestead is sufficient.[38]  Thus, when a claimant actually resides at the property, a court generally does not need to investigate the second prong of "intention to claim as a homestead," because actually residing on property is "the most satisfactory and convincing evidence of intention."[39]  Additionally, while not required, actual

---

[33] *Laster v. First Huntsville Props. Co.*, 826 S.W.2d. 125, 129-30 (Tex. 1991).

[34] *Inwood N. Homeowners' Ass'n v. Harris*, 736 S.W.2d 632, 634-35 (Tex. 1987).

[35] The court hastens to add that this current dispute does not involve section 522 of the Bankruptcy Code, or whether the Plaintiff/Debtor had a valid homestead exemption on the Mockingbird Property at the outset of his bankruptcy case.  In such a situation, Bankruptcy Rule 4003(c) would govern, and it provides that "the objecting party has the burden of proving that the exemptions are not properly claimed."

[36] *Bradley*, 960 F.2d at 507 (citing *Sims v. Beeson*, 545 S.W.2d 262, 263 (Tex. Civ. App.—Tyler 1976, writ ref'd n.r.e.)).

[37] *In re Mitchell*, 132 B.R. 553, 558 (Bankr. W.D. Tex. 1991) (citing *Greenawalt v. Cunningham*, 107 S.W.2d 1099 (Tex. Civ. App. 1937)).

[38] *Bradley*, 960 F.2d at 507.

[39] *PaineWebber Inc. v. Murray*, 260 B.R. 815, 822-823 (E.D. Tex. 2001) (citing *Youngblood v. Youngblood*, 76 S.W.2d 759, 760-61 (1934)).

designation by a claimant is considered *prima facie* evidence of what constitutes a family homestead.[40]

Here, the evidence demonstrated that the Plaintiff/Debtor and Mrs. Brei purchased the Mockingbird Property in 1998. At that time, they represented that they would be using the Mockingbird Property as their homestead.[41] Then, approximately three years later, on or about October 18, 2001, in connection with obtaining the 2001 Mockingbird Property Homestead Loan, the Plaintiff/Debtor and Mrs. Brie executed a Voluntary Designation of Homestead as to the Mockingbird Property that was filed in the Dallas County Property Records.[42] Moreover, the couple asserted a homestead exemption in the Mockingbird Property per the Dallas County Appraisal District records from 1999-2001 and 2009-2018. While there is a conspicuous gap in the Dallas County Appraisal District records, and there was *not* a homestead exemption for *tax* purposes filed in the Dallas County Appraisal District records as to the Mockingbird Property in 2004 (when the Defendant/Brinck made the loan to the Plaintiff/Debtor and Mrs. Brei), the court did hear credible testimony from the Plaintiff/Debtor that, in 2003 and 2004: (a) the Plaintiff/Debtor was still working in Dallas; (b) that he, Mrs. Brei, and their three children were all living at the Mockingbird Property during the week and spending weekends at the Malakoff Property; and (c) the Plaintiff/Debtor's and Mrs. Brei's first child started attending school in Highland Park in August 2004 (with the children having previously attended preschool at First Baptist in downtown Dallas). The Plaintiff/Debtor also testified that in 2003 and 2004 (including when he signed the Brinck Promissory Note and the Brinck Deeds of Trust) he

---

[40] *See Perry v. Dearing (In re Perry)*, 345 F.3d 303, 311 (5th Cir. 2003).

[41] *See* Plaintiff/Debtor Exhibit B.

[42] *See* Plaintiff/Debtor Exhibit D. There was also evidence of a "Designation of Homestead and Affidavit of Nonhomestead" that the Plaintiff/Debtor signed (not Mrs. Brei), wherein the Plaintiff/Debtor designated the Mockingbird Property as their homestead and that the Malakoff Property was not their homestead. This document was filed in the Deed Records for Henderson County on November 7, 2000. *See* Defendant/Brinck Exhibit 10.

considered the Mockingbird Property as his homestead.  While Mrs. Brei testified that she still considered the Malakoff Property her homestead from 1994 until she divorced her husband in 2008, the court simply did not consider such testimony very credible.  Thus, the court concludes that the more credible evidence demonstrates that the Plaintiff/Debtor has shown both overt acts as well as an intent to claim the Mockingbird Property as his homestead starting in at least 2001 (and likely earlier), thus satisfying the low hurdle necessary under Texas law for the Plaintiff/Debtor to claim a homestead exemption in the Mockingbird Property.

**C.      *Did the Plaintiff/Debtor and Mrs. Brei Abandon their Homestead Exemption in the Malakoff Property and Establish a New Homestead at the Mockingbird Property on or Before Obtaining the Loan from the Defendant Brinck?***

But not so fast.  The Defendant/Brinck has argued that, because the Plaintiff/Debtor and Mrs. Brei had initially claimed the Malakoff Property as their homestead—and because they still owned it for many years after acquiring the Mockingbird Property—the court must first find abandonment of the Malakoff Property as the Plaintiff/Debtor's homestead, in order for the Plaintiff/Debtor to subsequently assert a homestead exemption in the Mockingbird Property.  Indeed, the Plaintiff/Debtor and Mrs. Brei purchased the Malakoff Property several years before the Mockingbird Property (in 1994) and, as earlier indicated, asserted a homestead exemption in the Malakoff Property per the Henderson County Appraisal District records from at least 1999-2011.[43]

When a claimant ultimately chooses to abandon a homestead and establish a new homestead (as the Plaintiff/Debtor has purported to have done in this case), the legal analysis takes on an additional layer.  Under Texas law, property that has been established as a homestead

---

[43] Note, no evidence was provided as to what the Henderson County Appraisal District records reflected prior to 1999.  However, there was an Application for Residential Homestead Exemption signed by Mary Catherine Miller (*i.e.*, Mrs. Brei) dated February 21, 1995, shown to have been received by Henderson County on February 23, 1995. *See* Defendant/Brinck Exhibit 3.

will not lose that character unless abandonment, death, or alienation occurs.[44]   The party

claiming abandonment has the burden of proving abandonment.[45]   Here, since the Malakoff

Property was owned first and there is evidence that the Plaintiff/Debtor and Mrs. Brie claimed

homestead status on it before acquiring the Mockingbird Property[46] (and certainly prior to the

time of the Defendant/Brinck's loan in 2004), it appears that the Plaintiff/Debtor would have the

additional burden of proving his ***abandonment*** of the Malakoff Property as a homestead.

What constitutes abandonment?  In order to establish abandonment, there must be "both

the cessation or discontinuance of use of the property as a homestead, coupled with the intent to

permanently abandon the homestead."[47]  It has been held that, while simply changing residence

to a new home and temporarily renting out the old home does not necessarily equate to

abandonment, where it is clear that there has been a discontinuance of use of the old home

coupled with an intention not to return and use it as a homestead, abandonment has occurred.[48]

Additionally, the evidence establishing abandonment of a homestead "must be undeniably clear"

---

[44] *Thaw v. Schachar (In re Thaw)*, No. 15-40321, 2015 WL 5718970, at *5 (5th Cir. Sept. 30, 2015) (unpublished) (citing *Duran v. Henderson*, 71 S.W.3d 833, 842 (Tex. App.—Texarkana 2002, pet. denied)).  *See also Majeski v. Estate of Majeski*, 163 S.W.3d 102, 107 (Tex. App.—Austin 2005, pet. denied); *Wilcox v. Marriott*, 103 S.W.3d 469, 472 (Tex. App.—San Antonio 2003, pet. denied) (citing *Garrard v. Henderson*, 209 S.W.2d 225, 229 (Tex. Civ. App.—Dallas 1948, no writ)).

[45] *Sullivan v. Barnett*, 471 S.W.2d 39, 43 (Tex. 1971).

[46] *See* note 43, *supra*.

[47] *Estate of Montague v. Nat'l Loan Investors, L.P.*, 70 S.W.3d 242, 248 (Tex. App.—San Antonio 2001 pet. denied) (citing *Womack v. Redden*, 846 S.W.2d 5, 7 (Tex. Civ. App.—Texarkana 1992, writ denied) (per curiam)).  *See also Hudgins v. Thompson*, 211 S.W. 586, 587-88 (Tex. 1919).

[48] *Thomas v. Graham Mortg. Corp.*, 408 S.W. 3d 581, 589 (Tex. App.—Austin 2013) (citing *Rancho Oil Co. v. Powell*, 142 Tex. 63, 68-69 (1943)).  *See also* Tex. Prop. Code Ann. § 41.003 (West, Westlaw through 2017 1st C. Sess.) ("Temporary renting of a homestead does not change its homestead character if the homestead claimant has not acquired another homestead.").

and must be "beyond almost the shadow, at least [of] all reasonable ground of dispute, that there has been a total abandonment with an intention not to return and claim the exemption."[49]

Several courts have held that the best evidence of an abandonment of a residential homestead is *that a new and permanent home has been acquired and occupied*.[50] In fact, the establishment of one homestead and the abandonment of another have been held to be linked concepts.[51] Specifically, when confronted with the issue of abandonment, courts in Texas often analyze the facts to determine whether a new homestead has been established and then conclude that the old homestead has been abandoned as a legal result.[52] Thus, if the party claiming abandonment can ultimately show the establishment of a new *homestead* (*i.e.*, a combination of both overt acts of homestead usage and the intention on the part of the claimant to claim the property as their new homestead), abandonment would be the legal result. The court believes that a discussion of the case *Hinton v. Uvalde Paving Co.*, 77 S.W.2d 733 (Tex. Civ. App.— 1934, writ ref'd) best illustrates the concept discussed above.

In *Hinton*, Uvalde Paving Company sued Mrs. Eva Hinton, administratrix of the estate of her late husband, D. H. Mitchell, to recover the balance due on two street paving certificates and to establish liens on property that they had owned on Catherine Street.[53] In response, Mrs. Hinton argued that the property on Catherine Street was her and her late husband's protected

---

[49] *Burkhardt v. Lieberman*, 159 S.W.2d 847, 852 (Tex. 1942) (quoting *Gouhenant v. Cockrell*, 20 Tex. 96, 98 (Tex. 1857)).

[50] *Coury v. Prot*, 85 F.3d 244, 254 (5th Cir. 1996) (citing *Panhandle Const. Co. v. Wiseman*, 110 S.W.2d 615, 617 (Tex. Civ. App.—Amarillo 1937, writ dism'd)). By way of example, this could include the acquisition of another home, removal of the family from one dwelling to another, its occupancy and use as a homestead, and an absence of acts evidencing an intention to return to the former home. *Kendall Builders, Inc. v. Chesson*, 149 S.W.3d 796, 809 (Tex. App.—Austin, 2004, pet. denied) (citing *Hinton v. Uvalde Paving Co.*, 77 S.W.2d 733, 736 (Tex. Civ. App.— Dallas 1934, writ ref'd)).

[51] *See Silvers v. Welch*, 91 S.W.2d 686, 687–88 (1936).

[52] *See, e.g., id. See also Carstens v. Landrum*, 17 S.W.2d 803, 804–05 (Tex. 1929).

[53] *Hinton*, 77 S.W.2d at 734.

homestead.[54] At the trial court level, the district court had only submitted the issue of attorney's fees to the jury, finding that the undisputed evidence established that the paving certificates created valid liens upon the Catherine Street property because, at the time the liens were placed on the property, D.H. Mitchell and his wife (now Mrs. Hinton) owned another piece of property on Pacific Avenue upon which they resided and that this property was the homestead of D.H. Mitchell and his wife, not the Catherine Street property.[55] On appeal, the court of civil appeals held that the lower court did not err in finding that the Pacific Avenue property was the homestead of Mr. and Mrs. Mitchell at the time the improvement liens accrued. Specifically, the undisputed evidence had shown: (1) D. H. Mitchell and his wife acquired title to the Catherine street property about 1921 or 1922, resided thereon and made it their homestead until about three or four years before the street improvements were made, at which time they moved to and resided at another place they owned on Pacific Avenue; (2) the Catherine Street property, after being vacated, was rented and occupied by tenants; (3) shortly after moving from the Catherine Street place, Mr. and Mrs. Mitchell placed a loan of $1,000 thereon; and that (4) Mrs. Mitchell continued to occupy the Pacific Avenue place for about a year after the death of Mr. Mitchell, and was residing there at the time of her marriage to Mr. Hinton.[56] On appeal, Mrs. Hinton specifically argued that her testimony that "she and her former husband claimed the Catherine [S]treet place as their homestead; that they never claimed the other place as their homestead, nor did they intend to permanently reside there" and certain other witness testimony was not properly given consideration by the lower court.[57] However, the court of civil appeals determined that the

---

[54] *Id.*

[55] *Id.*

[56] *Id.* at 735.

[57] *Id.* at 735-36.

record was barren of any facts supporting Ms. Hinton's arguments[58] and ultimately held that the couple's "removal from the Catherine [S]treet place to the Pacific [A]venue place, and its occupancy and use as a homestead, unaccompanied by any act evidencing an intention to return to the former home, silently, but effectively, proclaimed it to be their homestead, and constituted the highest and most conclusive evidence of the abandonment of the Catherine [S]treet property as a homestead."[59]

Here, the court believes that the Plaintiff/Debtor has met his burden of showing that there was an abandonment of the Malakoff Property as a homestead in favor of the Mockingbird Property. Again, the evidence demonstrates that, in 1994, the Plaintiff/Debtor and Mrs. Brei purchased the Malakoff Property and established the Malakoff Property as their homestead. This is based upon the testimony of both the Plaintiff/Debtor and Mrs. Brei as well as the fact that they asserted a homestead exemption in the Malakoff Property per the Henderson County Appraisal District records from 1995-2011.[60] However, as set forth in detail above, the evidence also established that the Plaintiff/Debtor and Mrs. Brei purchased and established a new homestead at the Mockingbird Property in 1998—still representing it to be their homestead to a home equity lender in 2001. More importantly, the credible evidence was that the family was living at the Mockingbird Property during the week, were working in Dallas, and the children attended pre-school and school in Dallas. Accordingly, the court concludes there was, in fact, abandonment of the Malakoff Property as the Plaintiff/Debtor and Mrs. Brei's homestead and the

---

[58] The court of civil appeals also noted that "if, however, it be assumed that they did not intend to abandon the Catherine street property as a homestead, the continuity of this intention was certainly broken when they mortgaged the property to secure a loan of $1,000, for it will not be assumed that they would be parties to the void, illegal, and futile act of mortgaging their homestead." *Id.* at 736.

[59] *Id.* at 736.

[60] Note, no evidence was provided as to what the Henderson County Property Records reflected prior to 1999. However, there was an Application for Residential Homestead Exemption submitted into evidence signed by Mary Catherine Miller (*i.e.*, Mrs. Brei) dated February 21, 1995. *See* Defendant/Brinck Exhibit 3.

establishment of a new homestead at the Mockingbird Property and that, importantly, all of this took place prior to the Plaintiff/Debtor and Mrs. Brei signing the note and deeds of trust with the Defendant/Brinck in February 2004.

Regardless of any abandonment of the Malakoff Property and establishment of the Mockingbird Property as a homestead in or before 2001, the Defendant/Brinck nevertheless argues that there was a subsequent abandonment of the Mockingbird Property as the Plaintiff/Debtor's homestead and a re-establishment of the Plaintiff/Debtor's homestead at the Malakoff Property in 2003, as a result of the Plaintiff/Debtor and Mrs. Brei signing the 2003 Malakoff Property Home Equity Note.

### D. *Did the Plaintiff/Debtor and Mrs. Brei Abandon the Mockingbird Property as their Homestead in 2003 and Re-Establish the Malakoff Property as Their Homestead on or Before Obtaining the Loan from the Defendant/Brinck?*

Again, the party asserting abandonment (in this later instance, it would be the Defendant/Brinck) has the burden of proof on the issue of abandonment. Here, the Defendant/Brinck has argued that, as a result of the Plaintiff/Debtor and Mrs. Brei executing the 2003 Malakoff Property Home Equity Note, which provided that "Borrower now occupies and uses the Property as Borrower's Texas homestead and shall continue to occupy the Property for at least one year after the date of this Security Instrument," the Plaintiff/Debtor and Mrs. Brei effectively abandoned their homestead interest in the Mockingbird Property and established a new homestead interest in the Malakoff Property. The court does not believe this evidence meets the burden of proof with regard to abandonment.

First, the Plaintiff/Debtor testified that when he signed the 2003 Malakoff Property Home Equity Note, he did not adhere to Paragraph 6. Specifically, the Plaintiff/Debtor testified that he was still working in Dallas at that time and that he, Mrs. Brei, and their three children were all still living at the Mockingbird Property during the week and spending weekends at the Malakoff Property. Additionally, the only other evidence that the Defendant/Brinck has shown of

abandonment was Mrs. Brei's testimony (which this court considered hard to swallow) that she believed that the Malakoff Property was her homestead when she signed the 2003 Malakoff Property Home Equity Note. This evidence alone does not rise to the level necessary to show "beyond almost the shadow, at least [of] all reasonable ground of dispute" that there was *total abandonment* of the Mockingbird Property as a homestead with an intention not to return and claim the exemption.

Accordingly, the court concludes that, in 2003, there was not an abandonment of the Plaintiff/Debtor and Mrs. Brei's homestead in the Mockingbird Property and re-establishment of a homestead in the Malakoff Property. Thus, the Mockingbird Property was the Plaintiff/Debtor's and Mrs. Brei's homestead at the time they signed the Brinck Promissory Note and the Brinck Deeds of Trust.

###### E.   *Case Law Discussing "Dual Residences" and, Sometimes, "Ambiguous Possession."*

Several courts in Texas, over the generations, have confronted situations in which a debtor had dual residences and obfuscation as to which was the debtor's true homestead. Some of these cases discuss the complexities of "ambiguous possession." The court is not convinced that there was ambiguous possession (or, perhaps more pointedly, that there was ambiguous *usage and intent*) regarding the two residences in the case at bar. But what if there was? The principles derived from these dual residence cases can be distilled down to the following.

First, physical facts of occupancy of the property as a home (*i.e.,* overt actions of usage as a home) are what matter most and generally trump everything else. Just because there are dual residences does not mean that there is ambiguity regarding which is genuinely the homestead.

Second, when there is, indeed, genuine obfuscation or ambiguity as to the physical facts of usage, courts tend to defer to the subjective intent of the homestead claimant.

Third, occasionally, rather than deferring to subjective intent, courts will apply an estoppel doctrine against a debtor who is claiming one residence versus another he owns as a homestead. But establishing estoppel seems to be a high hurdle. In this regard, claiming a property as a homestead for *tax purposes* in county records is not dispositive, controlling, or otherwise likely to have estoppel effect. And, in contrast to tax exemption claims in county records, ***declarations of a property owner to a lender*** may actually estop him from asserting homestead character of property—but ***only as to a property not actually being occupied as a home***. The case law dealing with this latter estoppel concept tends to be old and, frankly, a little hard to understand. But what *is* clear is that, for this estoppel notion to be triggered, there would have to be affirmative representations to a lender as to the homestead/nonhomestead character of an ambiguously-utilized property and the lender would have had to have relied on the representation. Even in this latter context, the estoppel argument does not always go the lender's way—again, overt usage as a homestead is always going to trump all other factors.

A couple of cases in the bankruptcy context that dealt with dual residences and ambiguous possession (and which tackled whether to defer to subjective intent) were this court's *In re Tinsley*[61] opinion and Judge Leif M. Clark's *In re Mitchell* [62] opinion.

First, in *Mitchell*, the debtor, Mr. Mitchell, owned land that had been in his family for almost 80 years (the "Hillsboro Property").[63] Mr. Mitchell's parents still lived on the land but had sold it to their son in 1979, on the eve of foreclosure by the first lienholder, evidently to save the farm. Mr. Mitchell made payments on the farm and went there frequently on the weekends and sometimes during the week in the summertime. In November 1986, Mr. Mitchell remarried

---

[61] *In re Tinsley*, No. 09-36036-SGJ-7, 2010 WL 4823208, at * 1 (Bankr. N.D. Tex. Nov. 16, 2010).

[62] *In re Mitchell*, 132 B.R. 553, 558 (Bankr. W.D. Tex. 1991).

[63] *Mitchell*, 80 B.R. at 373.

and took up residence with his new wife and her two children at her home (*i.e.*, her separate property) in Garland, Texas near Dallas (the "Garland Property"). During the summer, they would take the children down to the Hillsboro Property for a week at a time. Moreover, during the school year, Mr. Mitchell and his wife would go to the Hillsboro Property on the weekends.[64] After Mr. Mitchell filed for bankruptcy in March 1987, he claimed the Hillsboro Property as exempt on his schedules, which was subsequently objected to by one of Mr. Mitchell's creditors.[65] Mr. Mitchell argued that the family's use of both properties rendered both the Garland Property and the Hillsboro Property susceptible to homestead characterization, and that, therefore, he was entitled to designate which property he wanted to claim as exempt. Specifically, Mr. Mitchell and his wife testified with great conviction that they preferred living in the country and, as soon as their children graduated from school, they would move to the Hillsboro Property permanently. Specifically, Mr. Mitchell argued that his case fell within the ambit of those Texas cases which hold that a court may (or, in fact, was required to) honor a debtor's subjective intent, when more than one property was actually used as a residence, under circumstances sufficiently ambiguous so that determining which property was the debtor's homestead was impossible merely from observing how it was used.[66]

In determining how to approach this "dual residence" scenario, the bankruptcy court in *Mitchell* looked to see whether the physical facts surrounding the debtor's use of the two properties in question was so ambiguous that one could not tell from mere observation which of the two properties was, in fact, the debtor's homestead. If there was no ambiguity, a designation

---

[64] *Id.*

[65] *Id.* at 381.

[66] *Id.* at 381-82. *See also Wootton v. Jones*, 286 S.W. 680, 687 (Tex. Civ. App.—Austin 1926, writ dism'd).

was immaterial.[67]  The court noted that an "ambiguity" as to usage is very fact intensive.  Thus, to aid its analysis, the bankruptcy court in *Mitchell* looked to two cases where an ambiguity was demonstrated.[68]

The first case that *Mitchell* examined was *Am. State Bank & Trust Co. v. Johnston*, 58 S.W.2d 880, 881 (Tex. Civ. App–San Antonio 1933).  In *Johnston*, the Johnstons moved onto ranch property that had been in the family for many years and dug wells, built a house, tilled the land, and had three children.  Ten years later, they purchased two lots in the city of Mercedes, which was about two miles away from the ranch property and also built a house on the two lots.  They lived in Mercedes during the school term, and through every school year after that.  While Mr. Johnston spent most of his time on the ranch property engaged in family farming and stock raising, Mrs. Johnston and the children spent the weekends, in good weather, and the time between school terms at the ranch property.  Based upon these facts, the Texas Civil Court of Appeals found it obvious that an ambiguity existed and that the Johnstons could claim and enforce their homestead exemption upon either property.[69]

The second case the *Mitchell* court examined was *Carstens v. Landrum*, 17 S.W.2d 803 (Tex. 1929).  In *Carstens*, a father (Mr. Landrum) sent his wife and children to San Antonio for schooling and to earn extra income, while he and his older children continued to work on the family's farm.  Though most of the furniture and household effects were moved to San Antonio, where Mr. Landrum's wife was living with the younger children in a rented facility, Mr. Landrum continued to live on the farm, renting out part of it and farming part of it.  Mr. Landrum's married son also lived on the farm and helped him work the farm.  However, shortly

---

[67] *Mitchell*, 80 B.R. at 382 (citing *Panhandle Constr. Co. v. Cont'l Sav. & Loan Ass'n*, 110 S.W.2d 632, 634-35 (Tex. Civ. App.—1937, writ dism'd)).

[68] *Mitchell*, 80 B.R. at 382.

[69] *Am. State Bank & Trust Co. v. Johnston*, 58 S.W.2d 880, 881-82 (Tex. Civ. App—San Antonio 1933).

after taking out a loan on the farm, the family moved to a house in San Antonio that they had purchased with the proceeds of the loan. They then returned to the farm for a period of three years before returning again to San Antonio.[70] The Commission of Appeals of Texas ultimately determined, and the Texas Supreme Court agreed, that under the circumstances, the occupancy of the farm by Mr. Landrum and his son "was palpably ambiguous in respect of the homestead exemption."[71]

Comparing the facts surrounding Mr. Mitchell's situation with the facts of *Landrum* and *Johnston*, the bankruptcy court in *Mitchell* was unable to find any ambiguity present. The bankruptcy court stated that, regardless of where Mr. Mitchell might have lived before he got married, there was little doubt where he resided once he married his wife. Specifically, their children attended school in Garland, he kept his work clothes in Garland, both he and his wife worked in the Dallas area, and neither Mr. Mitchell nor his wife were farmers. Additionally, the bankruptcy court found it important that the Hillsboro Property was already home to Mr. Mitchell's parents and was "not left over from his single days." Thus, Mr. Mitchell was not entitled to exempt the Hillsboro Property as his homestead.[72]

While Judge Clark did not find an ambiguity in the *Mitchell* case, this court did find such an ambiguity in the *Tinsley* case. In *Tinsley*, the debtor had claimed property located in Kaufman, Texas (the "Kaufman Property") as his exempt homestead after the filing of his chapter 7 bankruptcy case on September 10, 2009.[73] The court heard evidence that, between

---

[70] *Carstens v. Landrum*, 17 S.W.2d 803, 803-04 (Tex. 1929).

[71] *Id.* at 383.

[72] *Mitchell*, 80 B.R. at 383.

[73] *In re Tinsley*, No. 09-36036-SGJ-7, 2010 WL 4823208, at * 1 (Bankr. N.D. Tex. Nov. 16, 2010).

2004 and 2008, the debtor stayed at the Kaufman Property[74] every day to help care for his father and operate his own business at the Kaufman Property, which consisted of "running cattle" and growing hay. After the debtor's father passed away in September 24, 2008, the debtor married a Ms. Doss, on October 14, 2008, after which he continued to spend all of his days at the Kaufman Property running his cattle grazing business. The debtor also had two horses at the Kaufman Property which he rode two to three times per week. However, the debtor spent every night with Ms. Doss at a two-bedroom residence she acquired before marriage, which was located in Kemp, Texas (the "Kemp Property"). The Kemp Property was approximately 8.1 miles from the Kaufman Property. Although the debtor had not been spending his nights sleeping at the Kaufman Property, the house at the Kaufman Property was still getting full use. Specifically, the debtor's adult son and his family (consisting of his wife and three children) began living in the Kaufman Property (rent free) in November of 2008.[75] While noting that it was an extremely close call, the court did find there to be an ambiguity with regard to whether the Kaufman Property or the Kemp Property was the debtor's exempt homestead and noted that several important facts differentiated that case from *Mitchell*. Specifically, the court noted that:

> First, and perhaps most importantly, the Debtor testified that he spends almost every day at the Kaufman Property taking care of the property and running his farming business (albeit not an extremely profitable business at the moment). In fact, the only thing the Debtor did at the Kemp Property was sleep. There was also no evidence presented showing that he had abandoned the property. In fact, the Debtor testified that he and Ms. Doss were planning on moving to the Kaufman Property once they were able to complete some renovations and his son's children are older. Moreover, the Debtor and Ms. Doss have no children residing at the Kemp Property (which would be a meaningful factor), while the Debtor, of course, does have an adult son and grandchildren at the Kaufman Property. The Debtor testified with credibility that he considers the Kaufman Property his "principal residence." While his new bride is eight miles down the road, the Debtor's horses,

---

[74] The Kaufman Property was actually still titled in the debtor's deceased father's name, Keller Tinsley. However, the court ultimately held that the debtor still had a present possessory interest in the Kaufman Property, which was all that was legally required for the debtor to claim the Kaufman Property as his exempt homestead. *Id.* at *3-5.

[75] *Id.* at *1-2.

> boots, tools, livelihood the past 17 years, and now extended family are at the Kaufman Property 365 days a year.[76]

Accordingly, the court held that this was enough evidence to rise to the level of creating an "ambiguity" as to which property was really the debtor's homestead and, as a result, the court would defer to the debtor's subjective intent and permit the debtor to claim the Kaufman Property as his exempt homestead.

Here, the court believes that there was, at least at the time the Plaintiff/Debtor signed the loan documents with the Defendant/Brinck, some amount of ambiguity as to whether the Mockingbird Property or the Malakoff Property was the family's homestead. Specifically, at that time, the credible evidence was that the Plaintiff/Debtor was still working in Dallas and that he and his family were residing at the Mockingbird Property during the week and at the Malakoff Property on the weekends.  Further evidence of this ambiguity is demonstrated in the Brinck Deeds of Trust themselves.  Specifically, the Deed of Trust relating to the Malakoff Property explicitly makes note of a "Texas Home Equity Security Instrument dated March 19, 2003" (*i.e.*, the 2003 Malakoff Property Home Equity Note) and the Deed of Trust relating to the Mockingbird Property references a "Homestead Lien Contract and Deed of Trust dated October 3, 2001" (*i.e.*, the 2011 Mockingbird Property Homestead Loan).[77]  Thus, both pieces of property on which the Defendant/Brinck was purporting to take a lien had been characterized at some point in time as the Plaintiff/Debtor's and Mrs. Brei's homestead without any further disclaimers of homestead usage.  The court believes that this evidence further reinforces the notion that there was an ambiguity with regard to whether the Mockingbird Property

---

[76] *Id.* at *8.

[77] Plaintiff/Debtor Exhibit F.

or the Malakoff Property was the Plaintiff/Debtor's and Mrs. Brei's homestead. Thus, absent some reason to apply estoppel, the court should honor the Plaintiff/Debtor's subjective intent to claim the Mockingbird Property as his homestead at the time he executed the Brinck Promissory Note and Brinck Deeds of Trust—especially since there was overt usage of the Mockingbird Property as a homestead.

### F. But Do the Plaintiff/Debtor's Actions Somehow Operate to Estop Him From Claiming the Mockingbird Property as His Homestead?

To recap, the facts and analysis presented thus far demonstrate that there were ***overt acts of actual occupancy and usage*** of the Mockingbird Property as a homestead by the Plaintiff/Debtor and his family at the time of the loan by the Defendant/Brinck. The court also has concluded that the Malakoff Property had been abandoned as a homestead, as of the time of the loan by Defendant/Brinck, in favor or the Mockingbird Property, and that ***the Mockingbird Property was never abandoned*** to re-establish the Malakoff Property as a homestead. Moreover, ***even if there was a situation of ambiguity with regard to dual residences***, the court has determined that it should defer to what seems to have been the subjective intent of the Plaintiff/Debtor and treat the Mockingbird Property as having been his homestead in February 2004.

But does an ***estoppel doctrine*** somehow come into play here? Or maybe "***unclean hands***"?

As the court noted above, occasionally Texas courts will apply an estoppel doctrine against a debtor who is claiming one residence versus another he owns as a homestead—rather than deferring to his subjective intent. What about the Plaintiff/Debtor's activities in haphazardly claiming both the Mockingbird Property and Malakoff Property as exempt homestead property: (a) for ***tax purposes*** in county appraisal district records; and also (b) for

purposes of obtaining home equity loans on each property before the Defendant/Brinck came along?

The evidence was clear that the Plaintiff/Debtor and his ex-wife had filed multiple designations of homestead in the Henderson County Appraisal District records (as to the Malakoff Property) before, during, and after the time that the Defendant/Brinck made his loan—while there was no homestead designation on file in the Dallas County Appraisal District records for the Mockingbird Property when the Defendant/Brinck made his loan. And, similarly, the couple represented in 2001 that the Mockingbird Property was their homestead when obtaining a home equity loan on it in that year and represented that the Malakoff Property was their homestead when obtaining a home equity loan on it in year 2003. Does this matter *vis-a-vis* the Defendant/Brinck? One certainly might infer that the couple were playing rather fast and loose with these homestead assertions—permitting the couple to obtain tax benefits and loans when they needed them, but then oppose liens later—like the Plaintiff/Debtor is doing now with the lien of the Defendant/Brinck. The Defendant/Brinck has suggested that the willy-nilly approach of the Plaintiff/Debtor with regard to his homestead assertions might pose an estoppel problem for him—without actually raising the affirmative defense of "estoppel" in his pleadings. He has also more generally argued that "unclean hands" on the part of the Plaintiff/Debtor poses a problem for him.

However, case law is not on the Defendant/Brinck's side with facts like these. For one thing, well-reasoned case law has articulated that an assertion of a homestead exemption in county tax records is not going to have an estoppel effect with regard to a homestead assertion by a debtor.[78] And case law has also convincingly espoused the near-futility of a lender relying upon oral or written statements made by owners as to non-homestead usage—more specifically,

---

[78] *In re Terrill*, Case No. 17-60087, 2018 WL 3025399, at *3 (Bankr. N.D. Tex. June 15, 2018).

*these cannot change the character of a true homestead*, even if the end result seems to reward a dishonest debtor. The *actions* of a property owner are what most matter (*vis-à-vis* homestead usage) and "declarations made orally or in writing are alone insufficient."[79] A lender stands charged with notice of the fact of usage as a homestead, and it matters not what declarations to the contrary a borrower might make. When a property owner is in actual occupancy of his homestead, a lender or encumbrancer will be deemed to have acted with knowledge of the occupant's right to invoke the rule of homestead.

One of the most notable cases on this point is *In re Niland*, standing for the proposition that, if there are overt acts of possession and usage of a property by an owner as a homestead, then representations he made to a lender to the contrary (such as in a declaration of non-homestead or a declaration stating that another property was his homestead) to induce a lender to lend to him will not operate as an estoppel. The court stated in *Niland* that lenders must understand that liens cannot be fixed upon a homestead except in a narrow set of circumstances (*e.g.,* purchase money loans; home improvements; home equity loans; taxes), *and that declarations of a husband and wife of non-homestead usage—however made—must not be relied upon*. Lenders must further understand that no designation of homestead contrary to the fact of actual usage as a homestead will enable parties to evade the law and encumber homesteads with liens forbidden by the Constitution.[80]

In the *Niland* case, Mr. and Mrs. Niland bought a residential property in 1971 (the "Miron Property") and lived in it together for nine years until they separated in 1980, after which time Mr. Niland lived in it. "The bankruptcy court found that Niland lived in open, actual, and

---

[79] *Kennard v. MBank Waco, N.A.*, 970 F.2d 1455, 1460 (5th Cir. 1992) (citing *Rubarts v. First Gibraltar Bank, FSB (In re Rubarts)*, 896 F.2d 107, 112 (5th Cir. 1990) (emphasis in original)).

[80] *Truman v. Deason (In re Niland),* 825 F.2d 801 (5th Cir. 1987).

obvious possession of the property from September 1971 to the present, but that Niland rented the property to several individuals between 1979 and 1982."[81]  Meanwhile, in 1977 the Nilands bought a condominium for Mr. Niland's mother to live in, and the mother lived in the property from 1977 until her death in 1983.  In 1982, Mr. Niland needed a business loan.  ***In order to induce a lender ("Lender R") to make the business loan, Mr. Niland executed an affidavit stating that the condominium was his homestead, which was filed in the Dallas County deed records.***  Lender R loaned Mr. Niland the business funding he needed, and Mr. Niland gave Lender R a deed of trust covering the Miron Property.  Mr. Niland used part of the loan to pay off a note and first lien on the Miron Property and used the rest for his business.

But then Mr. Niland needed more loans.  Later in 1982, Mr. Niland went to yet a different lender ("Lender C") and, ***in order to induce it to make a $300,000 loan, Mr. Niland executed a false "Homestead Affidavit and Designation" which claimed the mother's condominium as his homestead and disclaimed any homestead right in the Miron Property and stated that he did not plan on residing in it or allowing a member of his family to reside on it***.  But it was undisputed that ***Mr. Niland was residing at the Miron Property*** at the time.  Lender C loaned Mr. Niland $300,000 in reliance on the affidavit.  Mr. Niland used $120,000 to pay off Lender R, and the remainder of the loan went to Mr. Niland.

In 1983, Mr. Niland once again declared that the condominium was his homestead in obtaining a release of an abstract of judgment lien that a judgment creditor had obtained as to the condominium.

Meanwhile, in 1983, Mr. Niland defaulted on the Lender C loan and it foreclosed on the Miron Property, ultimately selling the Miron Property at the foreclosure sale to Deason.  Deason thereafter sent a letter allowing Mr. Niland to remain at the Miron Property for a short time

---

[81] *Id.* at 803.

Page 32 of 40

period. Eventually Deason had to pursue eviction proceedings and, in the midst thereof, Mr. Niland filed a chapter 13 bankruptcy case.[82]

In the bankruptcy case, the chapter 13 trustee and Mr. Niland filed an adversary proceeding against Deason, seeking to avoid the foreclosure sale as a fraudulent transfer under section 548, arguing that Lender C's lien was invalid under state law, because the Miron Property was Mr. Niland's homestead. Deason answered contending that the Miron Property was not Mr. Niland's homestead or, if it was, he was estopped to claim it as such. The bankruptcy court ruled, in pertinent part, that the Miron Property was Mr. Niland's homestead and he was not estopped from claiming it as such. In so ruling, the court noted that many false statements were made by Mr. Niland along the way to the effect that the condominium, and not the Miron Property, was his homestead, and had stated: "*It is readily apparent that Niland was prepared to sign and swear to any statement regardless of its truth if the statement resulted in the extension of further credit or an escape from liability.*"[83]

On appeal, the Fifth Circuit ruled that the Miron Property was, indeed, the Debtor's homestead and he was *not estopped* from claiming it as such. The court stated that the threshold issue in establishing homestead rights is proof of overt acts of homestead usage and the intention on the part of the owner to claim the property as homestead. But "investigation of intention need not be made when the land is actually put to homestead uses." Such actual use of the land is the most satisfactory and convincing evidence of intention."[84] Here, the court agreed with the bankruptcy court that there was sufficient evidence Mr. Niland and his wife moved into the Miron Property in 1971 with the intention of using it as their home and this alone was sufficient

---

[82] *Id.* at 803-06.

[83] *Id.* at n. 1 (citing 50 B.R. at 475).

[84] *Id.* at 807.

to establish the initial homestead character of the property. ***The court went on to say that, once the initial homestead character of the property was established, the homestead status is presumed to continue and the burden shifts to others to show abandonment.***[85] No abandonment had been established here—although Nr. Niland had temporarily moved a couple of times and temporarily leased some rooms in it at such times.

As for the estoppel, the Fifth Circuit stated that Texas law was clear "that a homestead claimant is not estopped to assert his homestead rights in property on the basis of declarations made to the contrary if, at the time of the declarations, the claimant was in actual use and possession of the property." The Fifth Circuit cited the Texas Supreme Court as follows:

> The Constitution forbidding the fixing on the homestead of liens other than are expressly permitted, no estoppel can arise in favor of a lender who has attempted to secure a lien on homestead in actual use and possession of the family, based on declarations of the husband and wife made orally or in writing contrary to the fact. To hold otherwise would practically abrogate the Constitution.
>
> If property be homestead in fact and law, lenders must understand that liens can not be fixed upon it, and that declarations of husband and wife to the contrary, however made, must not be relied upon. They must further understand that no designation of homestead contrary to the fact will enable parties to evade the law and encumber homesteads with liens forbidden by the Constitution.[86]

The Fifth Circuit further stated that this rule applies even if, as in the *Niland* case, the homestead claimant has executed, acknowledged, and filed in the deed records an instrument designating a contrary homestead, adding:

> One rationale for this somewhat paternalistic rule is the perception that to permit an estoppel to arise on the basis of a sworn declaration by a person living on property was not his homestead would result in the routine execution of such affidavits by persons owning homesteads in order to obtain loans secured by homestead property for impermissible purposes, thereby rendering the constitutional homestead protection nugatory. . . . This rule is also based on a recognition that many in financial difficulties will sign anything to obtain money from lenders, and that if not put to a duty of inquiry, many lenders will simply have

---

[85] *Id.* at 807-08.

[86] *Id.* at 808 (citing to *Tex. Land & Loan Co. v. Blalock,* 76 Tex. 85, 89-89 (1890)).

the borrower execute a form affidavit stating that the property is not claimed as homestead.[87]

Another highly relevant case is the *Bland* case.[88]  In this case, like *Niland*, there were facts suggesting shenanigans, but a homestead claimant nevertheless prevailed.  Here, Mr. Bland (hereinafter, "Son Bland") and his wife obtained a bank loan.  Son Bland's father ("Father Bland") testified that he agreed to guarantee his son's loan for one year but never agreed to use certain real property on which he was building a home (the "Alvord Property") as collateral.  Nevertheless, Father Bland had gone to a title company and signed some documents—including a deed of trust, providing that the Alvord Property would be collateral on his son's $60,000 loan.  Father Bland took the position, in later litigation, that he never agreed to put up the Alvord Property as collateral.  Son Bland had an inconsistent story.  He said that he believed he (not his father) owned the Alvord Property.  He had told the bank that it was his property (not his homestead, but a weekend or vacation home) and that he could put it up as collateral.  He also said that Father Bland was not living on the property at the time of the loan and an observer would not be able to tell that anyone lived there. The bank's representative said he believed the son's representations that the Alvord Property was not a homestead.

The court ruled that Father Bland had a homestead interest in the Alvord Property and no estoppel principles applied.  All outward facts pointed to his overt usage of the property as his homestead.  Father Bland had no other property.  The court acknowledged that a confusing situation is presented whenever a homestead claimant owns two or more pieces of property at the time he mortgages one of them, and either of which could constitute a homestead (depending on what the owner's intention was).  In such a situation, "a declaration by the claimant of his

---

[87] *Niland*, 825 F.2d at 809.

[88] *First Interstate Bank of Bedford v. Bland*, 810 S.W.2d 277 (Tex. App.—Ft. Worth 1991, no pet.).

intention in this respect may estop claimant from disputing the truth of the declaration."[89]  The

court went through other examples in Texas case law where homestead claimants were estopped

to claim a homestead exemption.  Some, if not all of them involved *abandonment*—where a

homeowner *was not occupying the home* at a time a loan was made and made a recitation of

some sort that the property was not homestead property.[90]  The *Bland* case referred to these as

cases of "ambiguous possession."[91]  Quoting a case called *Shearer v. Allied Live Oak Bank,* 758

S.W.2d 940 (Tex. App.—Corpus Christi 1988, writ denied), that court wrote:

> It is the established rule of law in Texas that when the physical facts open to
> observation lead  to a conclusion that the property in question is not the homestead
> of the mortgagor, and its use is not inconsistent with the representations made that
> the property is disclaimed as a homestead, and these representations were intended
> to be and were relied upon by the lender, then the owner is estopped from asserting
> a homestead claim in derogation of the mortgage to secure the loan.

Distilled to its essence, it seems that *Bland* stands for the proposition that whenever there are two

properties—both of which a debtor and family are occupying and seem to be using as a

homestead, back and forth, intent can become relevant.  Moreover, affidavits and declarations of

a debtor as to a property being a non-homestead or some other property being a homestead (and

a lender's alleged reliance on same) would not necessarily be dispositive and generally cannot be

used to estop a debtor from asserting a homestead interest as to a property—*except that, in cases*

*where there are two properties and it is ambiguous which is the homestead, a declaration*

*might have estoppel effect and/or at least be deemed indicative of intent*.  But estoppel seems to

---

[89] *Id.* at 284 (citing *Hughes v. Wruble*, 131 Tex. 444, 448, 116 S.W.2d 368, 370 (1938)).

[90] *E.g., Alexander v. Wilson*, 124 Tex. 392, 77 S.W.2d 873 (1935).

[91] *Bland*, 810 S.W.2d at 284.

rarely come into play and is unlikely to be applied if a debtor has been actually occupying a property.[92]

  Here, the court determines that there are no facts justifying application of estoppel.  First, there is no doubt that the Plaintiff/Debtor and his family were actually occupying the Mockingbird Property in 2004 at the time of the Defendant/Brick loan.  But, equally important, *there was no declaration provided by the Plaintiff/Debtor and Mrs. Brie to the lender*.  And there *was no testimony by the Defendant/Brinck as to his genuine reliance* on anything—not statements of the Debtor/Plaintiff, or declarations, or tax records.  In a situation like this, the back-and-forth designations of homestead in the Dallas and Henderson County Appraisal District and Property Records are not at all dispositive and cannot form the basis of estoppel.  And while the Defendant/Brinck has argued that he specifically relied on the fact that the Plaintiff/Debtor had made certain representations regarding the Malakoff Property as part of the 2003 Malakoff Property Home Equity Note with Ameriquest Mortgage Company (which was included as a "permitted exception" in the Brinck Deeds of Trust), the actual testimony from the Defendant/Brinck was that he did not even read the Brinck Promissory Note or the Brinck Deeds of Trust, but had rather only "perused" the documents and had relied solely on his lawyer to protect his rights.  Therefore, at best, the Defendant/Brinck's reliance was really on his attorney,

---

[92] *See also In re Neale*, 274 F. Supp. 969, 973-74 (N.D. Tex. 1967) (tax exemptions on file were not dispositive and court ultimately ruled that the overt facts of where debtors genuinely resided over the years mattered the most); *Wootton v. Jones*, 286 S.W. 680, 687 (Tex. Civ. App.—Austin 1926, writ dism'd) ("Where property is actually occupied as a home, the rule is that neither husband nor wife is estopped to assert its homestead character by designating as homestead other property not so used, coupled with the declaration that the designated, and not the occupied, property is in fact the homestead.  The basis of the rule is that the physical facts charge the lender with notice of the homestead character of the occupied property.  On the other hand, where property is not actually occupied as a home, the husband and wife may, by their declarations, estop themselves from asserting its homestead character . . . The reason for this rule is that the homestead character of the property rests in the minds of the owners, and is not disclosed by physical facts which are open to observation; and, therefore, a representation made by them, not inconsistent with the physical facts, intended to be, and actually, relied upon by the lender in making the loan, brings the case clearly within the principles governing estoppel.").

not any specific representations that had been made by the Plaintiff/Debtor and Mrs. Brei in prior loan transactions with other mortgage companies.  Moreover, the court would also point out that the 2001 Mockingbird Property Homestead Loan was also listed as a "permitted exception" in the Brinck Deeds of Trust.  Thus, the Defendant/Brinck clearly had knowledge that the Plaintiff/Debtor had claimed both the Mockingbird Property and the Malakoff Property as a homestead at some point in time and still owned both properties, yet there was no evidence that the Defendant/Brinck did any type of due diligence to assess which property was being used as the Plaintiff/Debtor's homestead.  Ultimately, the court believes that the Defendant/Brinck proceeded at his own peril when he decided to loan money to the Plaintiff/Debtor and Mrs. Brei, and bad acts unrelated to this transaction should not be used to disallow the Plaintiff/Debtor's homestead exemption in the Mockingbird Property.

Turning now to the doctrine of unclean hands more generally, a "court may refuse to grant equitable relief to a plaintiff who has been guilty of unlawful or inequitable conduct."[93] The doctrine of unclean hands is based on the equitable maxim which states, "Whoever comes into equity must come with clean hands."[94]  "This maxim illustrates the principle that the court will not grant relief to a party who has engaged in wrongful, illegal, or unethical acts."[95]  One bankruptcy court has stated:

> The purpose of the unclean hands doctrine is to prevent a court from aiding or abetting a party in the commission of a fraud or other misconduct. 'The primary ***principle guiding application of the unclean hands doctrine is that the alleged inequitable conduct must be connected, i.e., have a relationship, to the matters***

---

[93] *Randall & Blake, Inc. v. Evans (In re Canion)*, 196 F.3d 579, 586 (5th Cir. 1999) (citing *Lazy M Ranch, Ltd. v. TXI Operations, LP*, 978 S.W.2d 678, 683 (Tex. App.—Austin 1998, pet denied) & *Schenck v. Halliday Real Estate, Inc.*, 803 S.W.2d 361, 366 (Tex. App.—Fort Worth 1990, no writ)).

[94] *In re King*, No. 10–05756–dd, 2010 WL 5173191, at *4 (Bankr. D.S.C. Sept. 13, 2010) (quoting Am. Jur. Equity § 98).

[95] *King*, 2010 WL 5173191 at *4.  *See also Middel v. Jake's on the Pike (In re Jake's on the Pike)*, 78 B.R. 461, 463 (Bankr. E.D. Va. 1987) ("The Bankruptcy Court is unquestionably a court of equity. The familiar maxim that 'he who comes into equity must come with clean hands' means that a litigant cannot call upon a court of equity to grant him extraordinary relief if he himself has been guilty of of [sic] inequitable or unconscionable conduct.").

*before the court for resolution*. We will not refuse relief to a party merely because it has engaged in misconduct which is unrelated to its claims before the court.'[96]

While "unclean hands" is often invoked by bankruptcy courts, as courts of equity, only a few have invoked the doctrine to deny a claimant's homestead exemption.[97]

Here, the court first heard evidence that the Plaintiff/Debtor essentially lied about the Malakoff Property being his homestead when he executed the 2003 Malakoff Property Home Equity Note on March 19, 2003 with Ameriquest Mortgage Company.  Additionally, the Plaintiff/Debtor also admitted that he failed to list a few items of personal property on his bankruptcy schedules (after being alerted to such fact by the Defendant/Brinck).  Finally, the Plaintiff/Debtor admitted to falsifying Mrs. Brei's signature (without her knowledge) at least three times in order to refinance the Mockingbird Property after he divorced Mrs. Brei.  While such actions should not be taken lightly, the court does not believe that they necessitate the stripping away of the Plaintiff/Debtor's homestead exemption in the Mockingbird Property.  Specifically, the court concludes that, while the Plaintiff/Debtor has made some mistakes (possibly rising to the level of fraud in certain instances), these mistakes do not appear to have

---

[96] *Freedom Med., Inc. v. Janssens (In re Janssens)*, 449 B.R. 42, 65 (Bankr. D. Md. 2010) (quoting *New Valley Corp. v. Corporate Prop. Assocs. 2 & 3 (In re New Valley Corp.)*, 181 F.3d 517, 525 (3d Cir. 1999)) (emphasis added).

[97] *See, e.g., In re Lafferty*, 469 B.R. 235, 245-46 (Bank. D.S.C. 2012) (under the doctrine of unclean hands, chapter 7 debtors, who were former spouses, lost any homestead exemptions which they otherwise would have been entitled to in their former marital residence; court found that debtors had transferred the property at issue to their then paramours with the wrongful intent to defraud objecting creditor and avoid creditor's judgment, and once the debtors realized that the transfer would not benefit them, they requested that the property be transferred back to them so they could obtain homestead exemptions when they filed their separate bankruptcy petitions; debtors were also found to be less than truthful during their bankruptcy proceedings, both in their testimony and in their bankruptcy documents and that these actions related to the homestead exemptions they sought and the judicial lien they wanted to avoid); *In re Riley*, 486 B.R. 711, 716-17 (Bankr. D.S.C. 2013) (debtor's home was destroyed by fire and he received insurance proceeds of $198,000 for the contents of his home and $289,000 for the loss of the structure; when debtor subsequently filed for Chapter 13 relief, he listed $100,000 in a checking account with Bank of America and claimed a homestead exemption of $51,450 and a wildcard exemption of $1,725 in the money held in the checking account; debtor's case was converted to Chapter 7 on the trustee's motion; court found that the debtor failed to properly explain what he did with $198,000 received as compensation for the contents of his home and failed to document the $90,000 he gave to a builder to begin reconstruction of his home, and concluded that the debtor's unclean hands precluded him from claiming an exemption in any portion of the insurance proceeds).

been directed to nor directly related to the Defendant/Brinck and his purported lien in the Mockingbird Property, and it would be inappropriate to apply the equitable doctrine of unclean hands for purposes of disallowing the Plaintiff/Debtor's homestead exemption in the Mockingbird Property.

In summation, the court concludes that the Plaintiff/Debtor is entitled to a judgment that the Mockingbird Property was his homestead at the time he executed the Brinck Note and Brinck Deeds of Trust and, as a result, the Defendant/Brinck's lien in the Mockingbird Property would not have attached and is void under Texas law.

**G.** ***Is the Plaintiff/Debtor Entitled to Reasonable Attorney's Fees for Bringing This Action Against the Defendant/Brinck?***

The Plaintiff/Debtor, as part of the Adversary Proceeding, has also sought the recovery of reasonable attorney's fees against the Defendant/Brinck, but did not cite to any legal authority in support of such request. To the extent the Plaintiff/Debtor still desires to recoup his reasonable attorney's fees, counsel for the Plaintiff/Debtor is directed to file a fee statement along with supporting legal authority for such fee shifting within thirty (30) days of entry of these Findings of Fact and Conclusions of Law.

Accordingly, it is

**ORDERED** that because the Plaintiff/Debtor had an enforceable homestead exemption in the Mockingbird Property at the time he executed the Brinck Promissory Note and the Brinck Deeds of Trusts, the Defendant/Brinck's lien did not attach to the Mockingbird Property. It is further

**ORDERED** that the Plaintiff/Debtor shall upload a separate judgment consistent herewith.

### END OF FINDINGS OF FACT AND CONCLUSIONS OF LAW ###